Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIM DODDS, derivatively on behalf of SNAP INC., | |
| Plaintiff, | Case No.:   2:22-cv-01569 |
| v. | |
| EVAN SPIEGEL, ROBERT MURPHY, DEREK ANDERSEN, JEREMI GORMAN, REBECCA MORROW, KELLY COFFEY, JOANNA COLES, LIZ JENKINS, ALAN GEORGE LAFLEY, MICHAEL LYNTON, STANLEY MERESMAN, SCOTT D. MILLER, and POPPY THORPE, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| and | |
| SNAP INC., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

---

Verified Shareholder Derivative Complaint

## INTRODUCTION

Plaintiff Tim Dodds ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Snap Inc. ("Snap" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Evan Spiegel, Robert Murphy, Derek Andersen, Jeremi Gorman, Rebecca Morrow, Kelly Coffey, Joanna Coles, Liz Jenkins, Alan George Lafley, Michael Lynton, Stanley Meresman, Scott D. Miller, and Poppy Thorpe (collectively, the "Individual Defendants," and together with Snap, the "Defendants") for breaches of their fiduciary duties as controlling shareholders, directors, and/or officers of Snap, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Snap, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Snap's directors and officers from July 22, 2020 through October 21, 2021 (the "Relevant Period").

2. Snap holds itself out as a camera company and its flagship product is the Snapchat application or "app" that allows users to take photos, apply image filters to

them, and send them to their friends and family. These "snaps" automatically delete unless saved. Snap also develops and sells products such as its Spectacles, which are eyeglasses integrated with a camera that are connected to the app. The Snapchat app has other functions, for example allowing consumers to view content published by enterprise and celebrity users, through which businesses can advertise to Snapchat users.

3. As an app provider, one of Snap's most important relationships is with Apple Inc. ("Apple"). It is through Apple's "App Store" that many users are able to download and use Snapchat.

4. In June 2020, Apple announced in a press release that its then-forthcoming operating system version for its iPhones, iOS 14, would have new features to enhance user privacy. These features went into effect in April 2021.

5. These privacy changes were material to Snap because they would limit the access Snap had to iPhone user data. This reduction in available data would make Snap less able to specifically tailor advertisements to users. In turn, advertisers would either look to advertise elsewhere or, at least, not be willing to pay as much to advertise in a less tailored manner. This development would hurt the Company's revenue.

6. However, rather than disclose this dynamic, throughout the Relevant Period the Individual Defendants caused the Company to issue false and misleading statements which minimized the effect these changes in Apple's privacy features would have on the Company's business.

7. The truth emerged on October 22, 2021, when the Company filed with the SEC its quarterly report on Form 10-Q for the quarter ended September 30, 2021 (the "3Q21 10-Q"). The 3Q21 10-Q disclosed that Snap had worse than expected revenue and guidance, attributable to the changes in Apple's privacy features. The 3Q21 10-Q admitted that the privacy "changes have adversely affected our targeting, measurement, and optimization capabilities" and that as a result Snap was experiencing "reduced demand and pricing for our advertising products[.]"

Verified Shareholder Derivative Complaint

8. On this news, the price of the Company's stock dropped from $75.11 per share at the close of trading on October 21, 2021, to $55.14 at the close of trading on October 22, 2021, a drop of $19.97, or approximately 26.6%.

9. During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Snap's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) Apple's announced privacy changes were likely to have, and then did have, a material negative impact on the Company's advertising revenue; (2) the Company's purported ability to maintain its advertising revenues despite Apple's privacy changes were overstated; (3) Snap understated the risks that the change in Apple's privacy policies posed to the Company, despite these risks being known; (4) Snap's privacy policies were not in line with Apple's changes, and thus Snap would not avoid disruption caused by the changes; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, Snap's public statements were materially false and misleading at all relevant times.

10. The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

11. In further breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

12. Moreover, seven of the Individual Defendants breached their fiduciary duties by engaging in insider sales while the price of the Company's common stock was artificially inflated by the false and misleading statements at issue, netting collective proceeds of over $818 million.

Verified Shareholder Derivative Complaint

13. In light of the Individual Defendants' misconduct—which has subjected Snap, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), its Chief Business Officer ("CBO"), and its Chief Accounting Officer ("CAO") to being named as defendants in a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action"), and further subjected Snap to the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, and the losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

14. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, many of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Snap's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

16. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

4

Verified Shareholder Derivative Complaint

17. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19. The Court has personal jurisdiction over each of the Defendants because each Defendant is either a conducting business in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

20. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District. Venue is also proper in this District because Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and Snap maintains its principal executive offices in this District.

## PARTIES

### Plaintiff

21. Plaintiff is a current shareholder of Snap common stock. Plaintiff has continuously held Snap common stock at all relevant times.

### Nominal Defendant Snap

22. Snap is a Delaware corporation with its principal executive offices located at 3000 31st Street, Santa Monica, CA 90405. Snap's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "SNAP."

23. The company's common stock is divided into three classes: Class A, Class B, and Class C. Class A common stock is publicly traded on the NYSE. Holders of Class A common stock have no voting rights. Class B common stock is not publicly traded, is entitled to one vote per share, and generally converts into Class A common stock upon

5

Verified Shareholder Derivative Complaint

transfer. Class C common stock is not publicly traded, is entitled to ten votes per share, and generally converts into Class B common stock upon transfer. The two stockholders of record for all Class C common stock, as of December 31, 2021, were Defendants Evan Spiegel ("Spiegel") and Robert Murphy ("Murphy"), Snap's cofounders.

**Defendant Spiegel**

24.    Defendant Spiegel cofounded the Company with Defendant Murphy and has been CEO and a director since March 2012. According to the Company's annual report for the year ended December 31, 2021 (the "2021 Fiscal Year") filed on Form 10-K with the SEC on February 4, 2022 (the "2021 10-K"), as of December 31, 2021, Defendant Spiegel beneficially owned 40,462,540 shares of the Company's Class A common stock, 5,862,410 shares of the Company's Class B common stock, and 123,683,019 shares of the Company's Class C common stock. Thus, he owned an aggregate of 170,007,969 shares of common stock representing 53.1% of the Company's outstanding voting power, making him a controlling shareholder. Given that the price per share of the Company's common stock at close on December 31, 2021 was $47.03, Defendant Spiegel beneficially owned approximately $8.0 billion worth of Snap common stock as of that date.[1]

25.    For the 2021 Fiscal Year, Defendant Spiegel received a $1 salary and $3,290,615 in all other compensation, which consisted of the costs of security, certain flights, and life insurance premiums paid by the Company on Defendant Spiegel's behalf. For the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), Defendant Spiegel received a $1 salary and $2,094,432 in all other compensation, which consisted of the costs of security, certain flights, and life insurance premiums paid by the Company on Defendant Spiegel's behalf.

---

[1] Given that the Company's Class B and Class C common stock can be converted into Class A common stock and then traded on the NYSE—for the purposes of calculating the value of the Individual Defendants' beneficial ownership herein—Snap's Class B and Class C common stock is valued the same as its Class A common stock.

Verified Shareholder Derivative Complaint

26. During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Spiegel made the following sales of Company stock at artificially inflated prices:

| Date | Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 1, 2021 | 1,542,228 | $65.76 | $101,413,828 |
| April 26, 2021 | 250,000 | $60.96 | $15,240,000 |
| June 2, 2021 | 403,784 | $62.20 | $25,116,576 |
| June 3, 2021 | 408,500 | $61.42 | $25,092,112 |
| June 4, 2021 | 411,250 | $60.80 | $25,004,822 |
| June 7, 2021 | 414,781 | $60.27 | $25,000,095 |
| June 8, 2021 | 408,875 | $61.17 | $25,010,474 |
| June 23, 2021 | 384,660 | $65.05 | $25,020,594 |
| June 24, 2021 | 371,150 | $67.58 | $25,081,574 |
| June 25, 2021 | 369,960 | $67.74 | $25,061,090 |
| July 6, 2021 | 213,325 | $70.02 | $14,936,376 |
| July 23, 2021 | 332,087 | $76.18 | $25,297,059 |
| July 26, 2021 | 327,915 | $76.50 | $25,084,185 |
| July 27, 2021 | 331,463 | $75.74 | $25,104,013 |
| July 28, 2021 | 339,035 | $74.03 | $25,099,100 |
| July 29, 2021 | 330,934 | $75.70 | $25,052,034 |
| July 30, 2021 | 332,900 | $75.10 | $25,001,788 |
| August 2, 2021 | 314,300 | $75.03 | $23,582,871 |
| August 4, 2021 | 333,270 | $75.02 | $25,000,249 |
| August 5, 2021 | 331,435 | $75.77 | $25,112,829 |
| August 6, 2021 | 149,695 | $77.03 | $11,531,604 |
| August 10, 2021 | 312,113 | $80.10 | $25,000,251 |
| September 23, 2021 | 77,215 | $80.01 | $6,178,049 |
| September 24, 2021 | 311,904 | $80.15 | $25,000,041 |
| September 27, 2021 | 306,522 | $81.75 | $25,058,173 |

Thus, in total, before the fraud was exposed, he sold 9,309,301 Company shares on inside information, for which he received approximately $649 million. His insider sales made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

Verified Shareholder Derivative Complaint

27.   The 2021 10-K stated the following about Defendant Spiegel:

*Evan Spiegel.* Mr. Spiegel is our co-founder and has served as our Chief Executive Officer and a member of our board of directors since May 2012. Mr. Spiegel holds a B.S. in Engineering – Product Design from Stanford University. We believe that Mr. Spiegel is qualified to serve as a member of our board based on the perspective and experience he brings as our co-founder and Chief Executive Officer.

**Defendant Murphy**

28.   Defendant Murphy cofounded the Company with Defendant Spiegel and has been Chief Technology Officer ("CTO") and a director since March 2012. According to the 2021 10-K, as of December 31, 2021, Defendant Murphy beneficially owned 82,267,528 shares of the Company's Class A common stock, 5,862,410 shares of the Company's Class B common stock, and 107,943,924 shares of the Company's Class C common stock. Thus, he owned an aggregate of 196,073,862 shares of common stock representing 46.4% of the Company's outstanding voting power. This beneficial ownership, along with his positions at the Company, make him controlling shareholder. Given that the price per share of the Company's common stock at close on December 31, 2021 was $47.03, Defendant Murphy beneficially owned approximately $9.2 billion worth of Snap common stock as of that date.

29.   For the 2021 Fiscal Year, Defendant Murphy received a $1 salary, and $184,436 in all other compensation, consisting of the costs of security and life insurance premiums paid by the Company on Defendant Murphy's behalf. For the 2020 Fiscal Year, Defendant Murphy received a $1 salary and $52,825 in all other compensation, consisting of the costs of security and life insurance premiums paid by the Company on Defendant Murphy's behalf.

30.   During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Murphy made the following sales of Company stock at artificially inflated prices:

8

Verified Shareholder Derivative Complaint

| Date | Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 19, 2021 | 85,485 | $58.54 | $5,004,120 |
| April 26, 2021 | 950,000 | $60.03 | $57,031,350 |
| July 26, 2021 | 950,000 | $76.14 | $72,330,150 |

Thus, in total, before the fraud was exposed, he sold 1,985,485 Company shares on inside information, for which he received approximately $134 million. His insider sales made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

31.    The 2021 10-K stated the following about Defendant Murphy:

*Robert Murphy.* Mr. Murphy is our co-founder and has served as our Chief Technology Officer and a member of our board of directors since May 2012. Mr. Murphy holds a B.S. in Mathematical and Computational Science from Stanford University. We believe that Mr. Murphy is qualified to serve as a member of our board of directors based on the perspective and experience he brings as our co-founder and Chief Technology Officer.

**Defendant Andersen**

32.    Defendant Derek Andersen ("Andersen") has been the Company's CFO since May 2019 and prior to that was the Company's Vice President of Finance since July 2018. According to the 2021 10-K, as of December 31, 2021, Defendant Andersen beneficially owned 951,605 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at close on December 31, 2021, was $47.03, Defendant Andersen beneficially owned approximately $44.8 million worth of Snap common stock as of that date.

33.    For the 2021 Fiscal Year, Defendant Andersen received $6,616,178 in total compensation from the Company, including $500,000 in salary, $5,876,814 in stock awards, $225,000 in non-equity incentive plan compensation, and $14,364 in all other compensation. For the 2020 Fiscal Year, Defendant Andersen received $6,591,276 in total compensation from the Company, including $500,000 in salary, $5,675,063 in stock

9

Verified Shareholder Derivative Complaint

awards, $400,000 in non-equity incentive plan compensation, and $16,213 in all other compensation.

34. During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Gorman made the following sales of Company stock at artificially inflated prices:

| Date | Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 16, 2021 | 14,151 | $62.46 | $883,871 |
| March 15, 2021 | 22,082 | $62.40 | $1,377,916 |
| March 16, 2021 | 33,657 | $63.22 | $2,127,896 |
| July 15, 2021 | 4,054 | $61.81 | $250,577 |
| July 16, 2021 | 8,803 | $58.70 | $516,744 |
| August 16, 2021 | 13,070 | $71.98 | $940,830 |
| September 15, 2021 | 15,773 | $71.06 | $1,120,750 |
| September 16, 2021 | 33,867 | $72.39 | $2,451,733 |
| October 15, 2021 | 4,055 | $76.76 | $311,261 |
| October 18, 2021 | 8,874 | $74.53 | $661,361 |

Thus, in total, before the fraud was exposed, he sold 158,386 Company shares on inside information, for which he received approximately $10.6 million. His insider sales made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

35. The 2021 10-K stated the following about Defendant Andersen:

*Derek Andersen.* Mr. Andersen has served as Chief Financial Officer since May 2019 and previously served as our Vice President of Finance since July 2018. Mr. Andersen was previously employed at Amazon.com, Inc. from March 2011 to June 2018, serving in a variety of roles, most recently as Vice President of Finance supporting Amazon's digital video business. Mr. Andersen also previously served in roles at Fox Interactive Media, including as Senior Vice President, Finance and Business Operations for IGN, and as Vice President, Finance. Mr. Andersen holds a B.B.A from Acadia University, an M.B.A from the Haas School of Business at the University of California, Berkeley, and is a CFA Charter Holder.

Verified Shareholder Derivative Complaint

**Defendant Gorman**

36. Defendant Jeremi Gorman ("Gorman") has been the Company's CBO since November 2018. According to the 2021 10-K, as of December 31, 2021, Defendant Gorman beneficially owned 1,542,062 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at close on December 31, 2021, was $47.03, Defendant Gorman beneficially owned approximately $72.5 million worth of Snap common stock as of that date.

37. For the 2021 Fiscal Year, Defendant Gorman received $6,623,445 in total compensation from the Company, including $500,000 in salary, $5,876,814 in stock awards, $225,000 in non-equity incentive plan compensation, and $21,631 in all other compensation. For the 2020 Fiscal Year, Defendant Gorman received $7,167,407 in total compensation from the Company, including $500,000 in salary, $6,242,566 in stock awards, $400,000 in non-equity incentive plan compensation, and $24,841 in all other compensation.

38. During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Gorman made the following sales of Company stock at artificially inflated prices:

| Date | Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 16, 2021 | 34,833 | $62.60 | $2,180,719 |
| February 17, 2021 | 15,914 | $62.07 | $987,781 |
| March 16, 2021 | 35,553 | $63.20 | $2,247,056 |
| March 17, 2021 | 15,554 | $60.82 | $945,994 |
| April 16, 2021 | 36,119 | $62.26 | $2,248,877 |
| April 19, 2021 | 15,271 | $60.18 | $919,069 |
| July 16, 2021 | 36,183 | $58.70 | $2,124,123 |
| July 19, 2021 | 15,239 | $58.43 | $890,460 |
| August 16, 2021 | 37,065 | $71.31 | $2,643,179 |
| August 18, 2021 | 13,145 | $71.78 | $943,561 |
| September 16, 2021 | 35,787 | $72.42 | $2,591,694 |
| September 17, 2021 | 13,567 | $73.27 | $994,108 |

11

Verified Shareholder Derivative Complaint

| October 18, 2021 | 36,472 | $74.45 | $2,715,340 |
| October 19, 2021 | 13,206 | $75.09 | $991,638 |

Thus, in total, before the fraud was exposed, she sold 353,908 Company shares on inside information, for which she received approximately $23.4 million. Her insider sales made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

39.    The 2021 10-K stated the following about Defendant Gorman:

*Jeremi Gorman.* Ms. Gorman has served as our Chief Business Officer since November 2018. Ms. Gorman was employed at Amazon.com, Inc., serving as Head of Global Field Advertising Sales from June 2018 to November 2018, as Head of Field Advertising Sales, U.S. from April 2015 to June 2018, and as Head of Entertainment Advertising Sales from 2012 to April 2015. Ms. Gorman serves on the board of directors of Samba TV, Inc. Ms. Gorman holds a B.A. from the University of California, Los Angeles.

**Defendant Morrow**

40.    Defendant Rebecca Morrow ("Morrow") has been the Company's CAO since September 2019.

41.    The 2021 10-K reported that Ms. Morrow's annual base salary was $415,000 as of December 31, 2021.

42.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Morrow made the following sales of Company stock at artificially inflated prices:

| Date | Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| April 16, 2021 | 9,060 | $62.28 | $564,293 |
| July 16, 2021 | 8,774 | $58.70 | $515,051 |
| October 18, 2021 | 8,817 | $74.45 | $656,469 |

Thus, in total, before the fraud was exposed, she sold 26,651 Company shares on inside information, for which she received approximately $1.7 million. Her insider sales made

12

Verified Shareholder Derivative Complaint

with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

43.    The 2021 10-K stated the following about Defendant Morrow:

*Rebecca Morrow.* Ms. Morrow has served as our Chief Accounting Officer and Controller since September 2019. From January 2018 to August 2019, Ms. Morrow served as Chief Accounting Officer at GoDaddy Inc., and previously served as Vice President of Finance and Head of Technical Accounting and Reporting from March 2015 to January 2018. Prior to that, Ms. Morrow served in various roles at Deloitte & Touche LLP, most recently serving as Managing Director in the Advisory Services practice from August 2013 to March 2015, and as Senior Manager in the Advisory Services practice from October 2008 to August 2013. Ms. Morrow holds a B.S. degree in Business and Accounting from the University of Idaho and a Masters of Accountancy degree from the David Eccles School of Business of the University of Utah.

**Defendant Coffey**

44.    Defendant Kelly Coffey ("Coffey") has served as a Company director since May 2020. She also serves as a member of the Audit Committee. According to the 2021 10-K, as of December 31, 2021, Defendant Coffey beneficially owned 20,273 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at close on December 31, 2021, was $47.03, Defendant Coffey beneficially owned approximately $953,000 worth of Snap common stock as of that date.

45.    For the 2021 Fiscal Year, Defendant Coffey received $324,561 in total compensation from the Company, including $75,000 in fees earned or paid in cash, $124,561 in stock awards, and $125,000 in option awards. For the 2020 Fiscal Year, Defendant Coffey received $346,394 in total compensation from the Company, including $34,239 in fees earned or paid in cash, $167,235 in stock awards, and $144,920 in option awards.

46.    The 2021 10-K stated the following about Defendant Coffey:

13

Verified Shareholder Derivative Complaint

*Kelly Coffey.* Ms. Coffey has served on our board of directors since May 2020. Ms. Coffey has served as Chief Executive Officer at City National Bank, a subsidiary of the Royal Bank of Canada (RBC), since February 2019. Prior to joining City National Bank, Ms. Coffey served in various leadership positions with J.P. Morgan from 1989 to January 2019, most recently serving as the Chief Executive Officer of J.P. Morgan's U.S. Private Bank. Ms. Coffey holds an M.S. in Foreign Service from Georgetown University and a B.A. in International Affairs & French from Lafayette College. We believe that Ms. Coffey is qualified to serve as a member of our board of directors due to her extensive leadership experience.

**Defendant Coles**

47.     Defendant Joanna Coles ("Coles") has served as a Company director since December 2015. She also serves as Chair of the Nominating and Corporate Governance Committee. According to the 2021 10-K, as of December 31, 2021, Defendant Coles beneficially owned 82,607 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at close on December 31, 2021, was $47.03, Defendant Coles beneficially owned approximately $3.9 million worth of Snap common stock as of that date.

48.     For the 2021 Fiscal Year, Defendant Coles received $324,561 in total compensation from the Company, including $75,000 in fees earned or paid in cash, $124,561 in stock awards, and $125,000 in option awards. For the 2020 Fiscal Year, Defendant Coles received $342,341 in total compensation from the Company, including $75,000 in fees earned or paid in cash, $142,332 in stock awards, and $125,009 in option awards.

49.     During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Coles made the following sales of Company stock at artificially inflated prices:

| Date | Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 8, 2021 | 2,438 | $63.39 | $154,544 |
| March 15, 2021 | 2,317 | $62.50 | $144,812 |

14

Verified Shareholder Derivative Complaint

| April 14, 2021 | 2,201 | $64.16 | $141,216 |
| July 14, 2021 | 1,887 | $64.53 | $121,768 |
| August 13, 2021 | 1,792 | $75.29 | $134,919 |
| September 14, 2021 | 1,993 | $71.75 | $142,997 |
| October 14, 2021 | 1,893 | $76.88 | $145,533 |

Thus, in total, before the fraud was exposed, she sold 14,521 Company shares on inside information, for which she received approximately $986,000. Her insider sales made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

50.    The 2021 10-K stated the following about Defendant Coles:

*Joanna Coles.* Ms. Coles has served on our board of directors since December 2015. Ms. Coles served as Chairperson and Chief Executive Officer of Northern Star Acquisition Corp. since July 2020, until its merger with Bark, Inc. (formerly Barkbox Inc.) in June 2021. Ms. Coles has served as Chairperson and Chief Executive Officer of Northern Star Investment Corp. II, Northern Star Investment Corp. III, and Northern Star Investment Corp. IV since November 2020. Prior to joining the Northern Star entities, Ms. Coles served as Chief Content Officer of Hearst Magazines from September 2016 to August 2018, overseeing editorial for Hearst's 300 titles globally, and as Editor-in-Chief of Cosmopolitan from September 2012 to September 2016. She edited Marie Claire magazine from April 2006 to September 2012. Ms. Coles worked for The Times of London from September 1998 to September 2001 and served as New York Bureau Chief for The Guardian from 1997 to 1998. She currently serves on the board of directors of Bark, Inc., Sonos, Inc., and is on the board of Women Entrepreneurs New York City, an initiative to encourage female entrepreneurship, with a focus on underserved communities. Ms. Coles holds a B.A. in English and American literature from the University of East Anglia. We believe that Ms. Coles is qualified to serve as a member of our board of directors due to her extensive experience working with content providers and advertisers.

**Defendant Jenkins**

51.    Defendant Liz Jenkins ("Jenkins") has served as a Company director since December 2020. She also serves as a member of the Audit Committee. According to the

15

Verified Shareholder Derivative Complaint

2021 10-K, as of December 31, 2021, Defendant Jenkins beneficially owned 4,723 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at close on December 31, 2021, was $47.03, Defendant Jenkins beneficially owned approximately $222,000 worth of Snap common stock as of that date.

52.   For the 2021 Fiscal Year, Defendant Jenkins received $316,816 in total compensation from the Company, including $67,225 in fees earned or paid in cash, $124,561 in stock awards, and $125,000 in option awards. For the 2020 Fiscal Year, Defendant Jenkins received $165,152 in total compensation from the Company, including $92,215 in stock awards and $72,937 in option awards.

53.   The 2021 10-K stated the following about Defendant Jenkins:

*Liz Jenkins.* Ms. Jenkins has served on our board of directors since December 2020. Ms. Jenkins has served as Chief Operating Officer at Be Sunshine, LLC (Hello Sunshine) since January 2021, and served as Chief Financial Officer at Be Sunshine, LLC (Hello Sunshine) from August 2018 to December 2020. Prior to joining Hello Sunshine, Ms. Jenkins worked at Sony Interactive Entertainment as the Head of Strategic Ventures for PlayStation from June 2017 to August 2018, the Creative Cartel as interim Co-Chief Executive Officer from October 2015 to June 2016, and Media Rights Capital from October 2008 to May 2015, most recently serving as Senior Vice President of Corporate Development and Strategy. She currently serves on the board of GLAAD. Ms. Jenkins holds an MBA from The Wharton School at the University of Pennsylvania and a BA in Economics from Stanford University. We believe that Ms. Jenkins is qualified to serve as a member of our board of directors due to her experience working with digital and technology companies.

**Defendant Lafley**

54.   Defendant Alan George "A.G." Lafley ("Lafley") served as a Company director from July 2016 until he resigned on December 31, 2021. During the Relevant Period, he was Chair of the Nominating and Corporate Governance Committee and a member of the Compensation Committee. According to the 2021 10-K, as of December 31, 2021, Defendant Lafley beneficially owned 236,128 shares of the Company's Class A

16

Verified Shareholder Derivative Complaint

common stock. Given that the price per share of the Company's common stock at close on December 31, 2021 was $47.03, Defendant Lafley beneficially owned approximately $11.1 million worth of Snap common stock as of that date.

55.    For the 2021 Fiscal Year, Defendant Lafley received $394,561 in total compensation from the Company, including $145,000 in fees earned or paid in cash, $124,561 in stock awards, and $125,000 in option awards. For the 2020 Fiscal Year, Defendant Lafley received $412,341 in total compensation from the Company, including $145,000 in fees earned or paid in cash, $142,332 in stock awards, and $125,009 in option awards.

56.    The Company's annual report for the 2020 Fiscal Year filed on Form 10-K with the SEC on February 5, 2021 (the "2020 10-K") stated the following about Defendant Lafley:

> *A.G. Lafley.* Mr. Lafley has served on our board of directors since July 2016. Mr. Lafley held various positions within The Procter & Gamble Company since 1977 and served as its President, Chief Executive Officer, and as a member of the board of directors from June 2000 until June 2009 and again from May 2013 to October 2015. He also served as Chairman of the Board from July 2002 through February 2010 and again from May 2013 through June 2016. From April 2010 to May 2013, Mr. Lafley served as a consultant and as a Senior Adviser at Clayton, Dubilier & Rice, LLC, a private equity firm. Mr. Lafley holds a B.A. from Hamilton College and an M.B.A. from Harvard Business School. We believe that Mr. Lafley is qualified to serve as a member of our board of directors due to his extensive leadership experience.

**Defendant Lynton**

57.    Defendant Michael Lynton ("Lynton") has served as a Company director since April 2013 and as Chairman of the Board since September 2016. He also serves as Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. According to the 2021 10-K, as of December 31, 2021, Defendant Lynton beneficially owned 1,075,407 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at close

17

Verified Shareholder Derivative Complaint

on December 31, 2021, was $47.03, Defendant Lynton beneficially owned approximately $50.6 million worth of Snap common stock as of that date.

58.    For the 2021 Fiscal Year, Defendant Lynton received $422,253 in total compensation from the Company, including $172,692 in fees earned or paid in cash, $124,561 in stock awards, and $125,000 in option awards. For the 2020 Fiscal Year, Defendant Lynton received $437,341 in total compensation from the Company, including $170,000 in fees earned or paid in cash, $142,332 in stock awards, and $125,009 in option awards.

59.    The 2021 10-K stated the following about Defendant Lynton:

*Michael Lynton.* Mr. Lynton has served on our board of directors since April 2013 and has been Chairman of our board of directors since September 2016. Mr. Lynton served as Chief Executive Officer or Co-Chief Executive Officer of Sony Entertainment Inc., an international entertainment company, from April 2012 until August 2017, as Chairman and Chief Executive Officer of Sony Pictures Entertainment Inc. from January 2004 until May 2017, and as CEO of Sony Corporation of America from March 2012 to August 2017. Mr. Lynton has served as a member of the board of directors of Ares Management Corp, Warner Music Group Corp., Schrodinger, Inc., and The Boston Beer Company. Mr. Lynton also served as a member of the board of directors of Pandora Media, Inc. from August 2017 until February 2019 and Pearson plc, from January 2018 to April 2021. Mr. Lynton holds a B.A. in History and Literature from Harvard College and an M.B.A. from Harvard Business School. We believe that Mr. Lynton is qualified to serve as a member of our board of directors and Chairman due to his extensive leadership experience.

**Defendant Meresman**

60.    Defendant Stanley Meresman ("Meresman") has served as a Company director since July 2015. He also serves as Chair of the Audit Committee. According to the 2021 10-K, as of December 31, 2021, Defendant Meresman beneficially owned 71,625 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at close on December 31, 2021, was $47.03, Defendant Meresman beneficially owned approximately $3.4 million worth of Snap common stock

18

Verified Shareholder Derivative Complaint

as of that date.

61.    For the 2021 Fiscal Year, Defendant Meresman received $349,959 in total compensation from the Company, including $100,398 in fees earned or paid in cash, $124,561 in stock awards, and $125,000 in option awards. For the 2020 Fiscal Year, Defendant Meresman received $367,341 in total compensation from the Company, including $100,000 in fees earned or paid in cash, $142,332 in stock awards, and $125,009 in option awards.

62.    The 2021 10-K stated the following about Defendant Meresman:

*Stanley Meresman.* Mr. Meresman has served on our board of directors since July 2015. During the last ten years, Mr. Meresman has served on the boards of directors of various public and private companies, including service as chair of the audit committee for some of these companies. He currently serves on the board of directors and as chair of the audit committee of Cloudflare, Inc., DoorDash, Inc., and Guardant Health, Inc. He served as a member of the board of directors and as chair of the audit committees of Palo Alto Networks, Inc. from September 2014 to December 2018, LinkedIn Corporation from October 2010 to December 2016, and Zynga Inc. from June 2011 to June 2015, and Medallia, Inc. from June 2015 to October 2021; and on the board of directors of Meru Networks, Inc. from September 2010 to May 2013, and Riverbed Technology, Inc. from March 2005 to May 2012. He also serves on the board of trustees of the Panetta Institute of Public Policy, a non-profit organization. From January 2004 to December 2004, Mr. Meresman was a Venture Partner with Technology Crossover Ventures, a private equity firm, and was General Partner and Chief Operating Officer of Technology Crossover Ventures from November 2001 to December 2003. During the four years before joining Technology Crossover Ventures, Mr. Meresman was a private investor and board member and advisor to several technology companies. From 1989 to 1997, Mr. Meresman served as the Senior Vice President and Chief Financial Officer of Silicon Graphics, Inc. Mr. Meresman holds a B.S. in Industrial Engineering and Operations Research from the University of California, Berkeley and an M.B.A. from the Stanford Graduate School of Business. We believe that Mr. Meresman is qualified to serve as a member of our board of directors and chair of our audit committee due to his background as a member of the board and chair of the audit committee of other public companies and his financial and accounting expertise from his prior

19

Verified Shareholder Derivative Complaint

extensive experience as chief financial officer of two publicly traded companies.

**Defendant Miller**

63. Defendant Scott D. Miller ("Miller") has served as a Company director since October 2016. He also serves as a member of both the Audit Committee and the Compensation Committee. According to the 2021 10-K, as of December 31, 2021, Defendant Miller beneficially owned 135,969 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at close on December 31, 2021, was $47.03, Defendant Miller beneficially owned approximately $6.4 million worth of Snap common stock as of that date.

64. For the 2021 Fiscal Year, Defendant Miller received $382,496 in total compensation from the Company, including $132,935 in fees earned or paid in cash, $124,561 in stock awards, and $125,000 in option awards. For the 2020 Fiscal Year, Defendant Miller received $342,341 in total compensation from the Company, including $75,000 in fees earned or paid in cash, $142,332 in stock awards, and $125,009 in option awards.

65. The 2021 10-K stated the following about Defendant Miller:

*Scott D. Miller.* Mr. Miller has served on our board of directors since October 2016. Mr. Miller is a founder and Chief Executive Officer of Council Advisors (formerly known as G100 Companies), and is also a founder and chairman of G100 Network and SSA & Company. Before joining Council Advisors in March 2004, Mr. Miller was employed at Hyatt Hotels Corporation, a global hospitality company, where he served as non-executive vice chairman from August 2003 to December 2004, president from January 1999 to August 2003, and executive vice president from September 1997 to July 2003. Mr. Miller served on the boards of QTS Realty Trust, Inc. from 2013 to 2021, Affinion Group, Inc. from 2011 to 2013, AXA Equitable Life Insurance Company from 2002 to 2012, Orbitz Worldwide, Inc. from 2003 to 2004, and NAVTEQ corporation from 2002 to 2006. He also serves on several private company boards. Mr. Miller holds a B.S. in Human Biology from Stanford University and an M.B.A. from the University of Chicago. We believe that Mr. Miller is qualified to serve as a member of our board of directors due to his extensive leadership experience.

Verified Shareholder Derivative Complaint

**Defendant Thorpe**

66. Defendant Poppy Thorpe ("Thorpe") has served as a Company director since August 2018. She also serves as a member of both the Audit Committee and the Compensation Committee. According to the 2021 10-K, as of December 31, 2021, Defendant Thorpe beneficially owned 62,333 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at close on December 31, 2021, was $47.03, Defendant Thorpe beneficially owned approximately $2.9 million worth of Snap common stock as of that date.

67. For the 2021 Fiscal Year, Defendant Thorpe received $324,561 in total compensation from the Company, including $75,000 in fees earned or paid in cash, $124,561 in stock awards, and $125,000 in option awards. For the 2020 Fiscal Year, Defendant Thorpe received $342,341 in total compensation from the Company, including $75,000 in fees earned or paid in cash, $142,332 in stock awards, and $125,009 in option awards.

68. During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Thorpe made the following sale of Company stock at an artificially inflated price:

| Date | Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| August 17, 2021 | 2,146 | $70.95 | $152,258 |

Her insider sale made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

69. The 2021 10-K stated the following about Defendant Thorpe:

*Poppy Thorpe.* Ms. Thorpe has served on our board of directors since August 2018. Ms. Thorpe is a freelance brand consultant. Previously, Ms. Thorpe served as Chief Marketing Officer at Sesame Inc. from March 2020 to May 2021, Head of Brand Marketing at Glossier Inc., a beauty brand,

21

Verified Shareholder Derivative Complaint

from April 2018 to February 2020, Head of Strategy at FNDR, a marketing and advertising agency, from August 2017 to April 2018, and Strategy Director at R/GA, a digital agency, from August 2014 to August 2017. Ms. Thorpe holds a B.A. in English and Film Studies from University of San Francisco. We believe that Ms. Thorpe is qualified to serve as a member of our board of directors due to her experience working with digital and technology companies and with advertisers.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

70. By reason of their positions as controlling shareholders, officers, directors, and/or fiduciaries of Snap and because of their ability to control the business and corporate affairs of Snap, the Individual Defendants owed to Snap and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Snap in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Snap and its shareholders so as to benefit all shareholders equally.

71. Each controlling shareholder, director, and officer of the Company owes to Snap and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

72. The Individual Defendants, because of their positions of control and authority as controlling shareholders, directors, and/or officers of Snap, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

73. To discharge their duties, the controlling shareholders, officers, and directors of Snap were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

74. Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence

22

Verified Shareholder Derivative Complaint

in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholders, directors, and officers of Snap, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Snap's Board at all relevant times.

75.     As controlling shareholders, senior executive officers, and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

76.     To discharge their duties, the controlling shareholders, officers, and directors of Snap were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the controlling shareholders, officers, and directors of Snap were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Snap's own Global Code of Conduct (the "Code of

Conduct");

      (b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

      (c)    remain informed as to how Snap conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

      (d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Snap and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

      (e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Snap's operations would comply with all applicable laws and Snap's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

      (f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

      (g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

      (h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

Verified Shareholder Derivative Complaint

77.    Each of the Individual Defendants further owed to Snap and the shareholders the duty of loyalty requiring that each favor Snap's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

78.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Snap and were at all times acting within the course and scope of such agency.

79.    Because of their controlling, advisory, executive, managerial, and directorial positions with Snap, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

80.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Snap.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

81.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

82.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

83. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and common course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, the Individual Defendants who are directors of Snap were direct, necessary, and substantial participants in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

84. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

85. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Snap and was at all times acting within the course and scope of such agency.

## SNAP'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### *Code of Conduct*

86. Snap's Code of Conduct provides that Company personnel must comply with the law, stating: "To be kind, we must comply with the law and our policies — and we must go beyond mere compliance and invest in the health of our stakeholders. It's not enough to avoid misconduct, we must act as a responsible corporate citizen in all we do."

87. The Company's Code of Conduct further defines the responsibilities of

Verified Shareholder Derivative Complaint

leaders at Snap as follows:

> If you're a manager or leader, you play a key role in upholding this Code. That role doesn't begin when a problem arises. Rather, it starts each day with small actions that establish safety, empathy, and trust on your teams and among your colleagues. It's about how you respond to bad news and whether you pause when someone raises a concern. It's about celebrating how someone does a job, not just the end result. And when you are the one who makes a mistake, it's about being vulnerable and sharing your learnings with the team. These small daily acts create space for your team to approach you honestly and without fear when they see issues.

88.     Regarding the use of Company assets, the Code of Conduct states: "Our investors trust us by using their resources to back our company. We honor that trust by safeguarding our corporate resources and always operating Snap fairly."

89.     The Code of Conduct emphasizes the importance of accurate Company records by stating:

> Our commitment to honesty is reflected in how we keep business records. Those records come in all shapes and sizes, from receipts to contracts to our user metrics and published financials. Whatever the type of record, we apply the same approach: we are truthful, transparent, and accurate in our documentation. That's the kind of company that investors and the public can trust.

90.     Regarding representations made to investors, the Code of Conduct states:

> Investors need to trust what we say because they make their investment decisions based on our disclosures. We take that trust seriously and never make misleading public statements, particularly those related to our finances, user metrics, and any other data about the company. Likewise, we are truthful and honest when communicating with third parties about our business.

91.     The Code of Conduct further emphasizes that: "Our global corporate citizenship begins by respecting the laws of the places where we operate."

Verified Shareholder Derivative Complaint

*Corporate Governance Guidelines*

92. Snap maintains Corporate Governance Guidelines which, among other things, describe certain responsibilities of the Board. The Corporate Governance Guidelines state, in relevant part:

**ROLE OF THE BOARD OF DIRECTORS**

Our stockholders select directors to provide oversight and strategic guidance to senior management. A director's responsibility is to fulfill his or her fiduciary duties of care and loyalty, and otherwise to exercise his or her business judgment in the best interests of Snap Inc. and our stockholders. Board service requires significant time and attention. More specifically, the Board has responsibilities to review, approve, and monitor fundamental financial and business strategies, assess Snap Inc.'s major risks, and consider ways to address those risks, select and oversee management, and establish and oversee processes to maintain Snap Inc.'s integrity. To fulfill their duties, directors must prepare for meetings and discussions with management, participate in Board meetings, review relevant materials, and serve on committees. We expect directors to maintain an attitude of constructive involvement and oversight, ask relevant and incisive questions, and demand honest and accurate answers. Directors must act with integrity and we expect them to demonstrate a commitment to Snap Inc., our values, our business, and long-term stockholder value.

*Charter of the Audit Committee of the Board of Directors*

93. Snap also maintains a Charter of the Audit Committee of the Board of Directors (the "Audit Committee Charter"). The Audit Committee Charter defines the "Purpose" of the Audit Committee as follows:

The purpose of the Audit Committee of Snap Inc. is to:

• help the Board of Directors oversee Snap Inc.'s corporate accounting and financial reporting processes, systems of internal control, and financial-statement audits;

• manage the selection, engagement terms, fees, qualifications, independence, and performance of the registered public accounting firms engaged as Snap Inc.'s independent outside auditors for the purpose of preparing or issuing an audit report or performing any services;

28

Verified Shareholder Derivative Complaint

• review any reports or disclosures required by applicable rules and regulations of the Securities and Exchange Commission (the "SEC") and applicable stock exchange;

• oversee the organization and performance of Snap Inc.'s internal audit function; and

• provide regular reports and information to the Board with respect to material issues

94. Regarding the Company's "Internal Control and Procedures," the Audit Committee Charter defines the Audit Committee's responsibilities as follows:

• **Risk Assessment and Management**. The Audit Committee will review and discuss with Snap Inc. management and the independent auditors Snap Inc.'s policies on financial risk management and assessment. The Audit Committee will provide regular reports to the Board about material issues affecting the quality or integrity of Snap Inc.'s financial statements, compliance with legal or regulatory requirements, the performance or independence of the independent auditors, the performance of Snap Inc.'s internal audit function, and other matters as the Audit Committee deems appropriate.

• **Internal Auditors**. The Audit Committee will review the audit plan of Snap Inc.'s Internal Audit team and discuss with that team the adequacy and effectiveness of Snap Inc.'s scope, staffing, and general audit approach. The Audit Committee will review any significant reports prepared by Snap Inc.'s internal auditors, as well as management's response. The head of the internal auditors will also report to and be evaluated by the Audit Committee.

• **Internal Control over Financial Reporting; Disclosure Controls**. The Audit Committee will confer with Snap Inc. management and the independent auditors concerning the scope, design, adequacy, and effectiveness of internal control over financial reporting and Snap Inc.'s disclosure controls and procedures. The Audit Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies. Periodically, the Audit Committee will meet in separate sessions with the independent auditors, Snap Inc.'s internal auditors, and Snap Inc.

29

Verified Shareholder Derivative Complaint

management to discuss any matters that any of these parties believe should be discussed privately with the Audit Committee.

• **Correspondence with Regulators**. The Audit Committee will consider and review with Snap Inc. management, the independent auditors, and outside advisors or accountants any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding Snap Inc.'s financial statements or accounting policies.

• **Complaint Procedures**. The Audit Committee is responsible for overseeing procedures for receiving, retaining, and investigating:

  ▪ complaints received by Snap Inc. regarding accounting, internal accounting controls, or auditing matters and the confidential; and

  ▪ confidential and anonymous submissions by employees concerning questionable accounting or auditing matters.

• **Ethical Compliance**. The Audit Committee will review the results of management's efforts to monitor compliance with Snap Inc.'s programs and policies adhering to applicable laws and rules, including Snap Inc.'s Code of Conduct.

• **Related Party Transactions**. The Audit Committee will review and approve, in accordance with Snap Inc.'s policies, any related party transaction as defined by applicable rules and regulations.

• **Cybersecurity and Privacy**. The Audit Committee will annually review with Snap Inc. management Snap Inc.'s cybersecurity and data privacy rules.

95. The Individual Defendants violated Snap's Code of Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the investing public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Also in violation of the Code of Conduct, the Individual Defendants failed to comply with all applicable laws and policies, act to uphold the Code of Conduct, safeguard corporate assets, keep accurate records, and communicate truthfully about the Company.

Verified Shareholder Derivative Complaint

96. Moreover, the Individual Defendants who served on the Board violated the Corporate Governance Guidelines by engaging in or permitting the scheme to issue materially false and misleading statements to the investing public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Corporate Governance Guidelines, the Individual Defendants who served on the Board failed to provide adequate oversight and strategic guidance to management, fulfill their fiduciary duties and exercise their business judgment appropriately, assess and address risks adequately, and maintain Snap's integrity.

97. Finally, the Individual Defendants who served on the Audit Committee violated the Audit Committee Charter by engaging in or permitting the scheme to issue materially false and misleading statements to the investing public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Also in violation of the Audit Committee Charter, the Individual Defendants who served on the Audit Committee failed to adequately oversee Snap's financial reporting processes and system of internal and disclosure controls, review the Company's SEC filings, assess and manage risk, monitor compliance with the Code of Conduct, and review the Company's data privacy rules.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

98. Snap holds itself out as a camera company and its flagship product is the Snapchat app that allows users to take photos, apply image filters to them, and send them to their friends and family. These "snaps" automatically delete unless saved. The Snapchat app has other functions, for example allowing consumers to view content

published by enterprise and celebrity users, that allow businesses to advertise to Snapchat users. Advertising constitutes the primary way Snap generates revenue.

99. Snapchat is made available to many users through Apple's App Store. In June 2020, Apple announced in a press release that its then-forthcoming operating system version for its iPhones, iOS 14, would have new features to enhance user privacy. Among other things, these new privacy features would limit the user data made available to Snap. These features went into effect in April 2021.

100. The attendant reduction in available data made Snap less able to specifically tailor advertisements to users. As a result, advertisers either found new means to advertise to their target audiences or else were not willing to pay as much to advertise through Snapchat as they previously had been. Rather than disclose this fact, the Individual Defendants made and caused Snap to make materially false and misleading statements to the investing public that disguised it.

### False and Misleading Statements

### *July 22, 2020 Quarterly Report*

101. On July 22, 2020 the Company filed its quarterly report on Form 10-Q with the SEC for the quarter ended June 30, 2020 (the "2Q20 10-Q"). The 2Q20 10-Q was signed by Defendants Andersen and Morrow and contained certifications signed by Defendants Spiegel and Andersen, pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX"), attesting to the accuracy of the financial statements contained in the 2Q20 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

102. The 2Q20 10-Q stated the following about the centrality of advertising to Snap's business:

> *We generate substantially all of our revenues by offering various advertising products on Snapchat,* which include Snap Ads and Sponsored Creative Tools, and measurement services, referred to as advertising

32

Verified Shareholder Derivative Complaint

revenue.

\* \* \*

*We sell advertising directly to advertisers* ("Snap-sold" revenue) *and certain partners* that provide content on Snapchat ("media partners") *also sell directly to advertisers* ("partner-sold" revenue).

\* \* \*

*We monetize our business primarily through advertising*. Our advertising products include Snap Ads and Sponsored Creative Tools. *We measure our business using ARPU [average revenue per user]* because it helps us understand the rate at which we're monetizing our daily user base.[2]

103. The 2Q20 10-Q noted that Apple was changing its privacy policy, but discussed the known negative impacts it would have on the Company's business as mere possibilities, stating:

Furthermore, changes to iOS or Android operating systems' practices and policies, such as *Apple's upcoming iOS update that may impose heightened restrictions on our access and use of user data, may reduce the quantity and quality of the data and metrics that can be collected or used by us and our partners*, *and adversely affect our ability to effectively target advertisements to users and demonstrate the value of our advertisements to advertisers,* any of which could reduce the demand and pricing for our advertising products and seriously harm our business. *The impact of these proposed changes on the overall mobile advertising ecosystem, our business, and the developers, partners, and advertisers within our community is uncertain* depending on how these changes are implemented, how we and the overall mobile advertising ecosystem adjusts, and how our partners, advertisers, and users respond, could seriously harm our business. Any adverse effects could be particularly material to us because we are still early in building our advertising business. *Our advertising revenue could be seriously harmed* by many other factors, including: . . . *changes in our analytics and measurement solutions*, including what we are permitted to collect and disclose under the terms of Apple's and Google's mobile operating system*, that demonstrate the value of our advertisements* and other commercial content; . . . [and] *our inability to collect and disclose*

---

[2] All bolded and italicized emphasis herein added, unless otherwise noted.

Verified Shareholder Derivative Complaint

*data* or access a user's Identifier for Advertising or similar deterministic identifier *that new and existing advertisers may find useful[.]*

***February 4, 2021 Earnings Conference Call***

104.    On February 4, 2021, the Company held an earnings conference call with investors and analysts to discuss the Company's financial results for the 2020 Fiscal Year and the quarter ended December 31, 2020. On that call, Defendant Gorman said the following about the Company's supposed commitment to privacy and how, due to this commitment, Apple's policy change would have little impact on the Company's business, stating:

I'll take the IDFA [Apple's Identifier for Advertisers] one first and the 4x growth as you're saying in our down funnel metrics, we're also thrilled to see that. But as it comes to IDFA and the changes, whether or not they will impact us. The reality is we admire Apple, and we believe that they are trying to do the right thing for their customers. ***Their focus on protecting privacy is aligned with our values and the way that we've built our business from the very beginning. So the change here that we're really focused on has less to do with IDFA for which Apple has long offered an opt-out.*** And instead on a much more broad policy change that requires Snapchatters to opt into tracking with other personal identifiers such as their e-mail address, which would make it harder for us and the overall digital ad ecosystem to match advertising outcomes. ***But we've been working really closely with Apple to implement SKAdNetwork, which is their privacy protective solution as well as building our own solutions that use aggregated data to protect privacy. We've been communicating very well with advertisers, we're educating them, talking about them deeply about these coming changes and encouraging them to implement our Conversion API and Measurement Kit to mitigate any of this***. And then longer term, we're investing in using first-party data from our platform and providing more opportunities for on platform conversion, which will really help. ***Overall, we feel really well prepared for these changes.*** But changes to this ecosystem are usually disruptive and the outcome is uncertain.

***February 5, 2021 Annual Report***

105.    On February 5, 2021, the Company filed the 2020 10-K with the SEC The 2020 10-K was signed by Defendants Andersen, Morrow, Spiegel, Murphy, Coffey, Coles, Jenkins, Lafley, Lynton, Meresman, Miller, and Thorpe and contained SOX

certifications signed by Defendants Spiegel and Andersen attesting to the accuracy of the financial statements contained in the 2020 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

106. The 2020 10-K said the following about the Company's advertising products, in relevant part:

> **Our Advertising Products**
> We connect both brand and direct response advertisers to Snapchatters globally. Our ad products are built on the same foundation that makes our consumer products successful. This means that *we can take the things we learn while creating our consumer products and apply them to building innovative and engaging advertising products familiar to our community.*
>
> *AR Ads*: ***Advertising through Snap's AR tools unlocks the ability to reach a unique audience in a highly differentiated way.*** Ads can be served as Sponsored Lenses or Sponsored Filters. Lenses are designed through our camera to take advantage of the reach and scale of our augmented reality platform to create visually engaging 3D experiences. Filters are entertaining, artistic overlays that appear after you take a Snap. These Lenses and Filters can be memorialized on Snapchat, through Brand Profiles that aggregate content, filters, and lenses in a single, easy to find place.
>
> *Snap Ads*: We let advertisers tell their stories the same way our users do, using full screen videos with sound. ***These also allow advertisers to integrate additional experiences and actions directly within these advertisements, including watching a long-form video, visiting a website, or installing an app. Snap Ads include the following***:
> - Single Image or Video Ads: These are full screen ads that are skippable, and can contain an attachment to enable Snapchatters to swipe up and take action.
> - Story Ads: Story Ads are branded tiles that live within the Discover section of the Stories tab that can be either video ads or a series of 3 to 20 images.
> - Collection Ads: Collection Ads feature four tappable tiles to showcase multiple products, giving Snapchatters a frictionless way to browse and buy.
> - ***Dynamic Ads: Dynamic ads leverage our machine learning***

35

Verified Shareholder Derivative Complaint

*algorithm to match a product catalog to serve the right ad to the right Snapchatter at the right time.*

- Commercials: Commercials are non-skippable for six seconds, but can last up to three minutes. These ads appear within Snapchat's curated content.

107. Regarding the Company's efforts to match advertisements to users based on user data, the 2020 10-K said, in relevant part:

*Campaign Management and Delivery*: **We aim to continually improve the way ads are purchased and delivered. We have invested heavily to build our self-serve advertising platform, which provides automated, sophisticated, and scalable ad buying and campaign management.**

We offer the ability to bid for advertisements that are designated to drive Snapchatters to: visit a website, visit a local business, call or text a business, download an app, or return to an app. Additionally, *our delivery framework continues to optimize relevance of ads across the entire platform by determining the best ad to show to any given user based on their real-time and historical attributes and activity. This decreases the number of wasted impressions while improving the effectiveness of the ads that are shown to our community. This helps advertisers increase their return on investment by providing more refined targeting, the ability to test and learn with different creatives or campaign attributes in real time, and the dynamics of our self-serve pricing.*

*Measuring Advertising Effectiveness*: **We offer third-party and first-party solutions to provide a vast array of analytics on campaign attributes like reach, frequency, demographics, and viewability; changes in perceptions like brand favorability or purchase intent; and lifts in actual behavior like purchases, foot traffic, app installs, and online purchases.**

108. Regarding the centrality of advertising to the Company's revenue, the 2020 10-K stated, in relevant part:

**We monetize our business primarily through advertising.** Our advertising products include Snap Ads and AR Ads. We measure our business using ARPU because it helps us understand the rate at which we are monetizing our daily user base.

\*          \*          \*

36

Verified Shareholder Derivative Complaint

*Revenue*

***We generate substantially all of our revenue through the sale of our advertising products***, which primarily include Snap Ads and AR Ads, ***and measurement services, referred to as advertising revenue***. Snap Ads may be subject to revenue sharing arrangements between us and the media partner. We also generate revenue from sales of our hardware product, Spectacles. This revenue is reported net of allowances for returns.

*                *                *

***We generate substantially all of our revenues by offering various advertising products on Snapchat***, which include Snap Ads and AR Ads, referred to as advertising revenue. AR Ads include Sponsored Filters and Sponsored Lenses. Sponsored Filters allow users to interact with an advertiser's brand by enabling stylized brand artwork to be overlaid on a Snap. Sponsored Lenses allow users to interact with an advertiser's brand by enabling branded augmented reality experiences.

109. The 2020 10-K also highlighted the Company's purported efforts to safeguard user privacy:

***Our approach to privacy is simple: Be upfront, offer choices, and never forget that our community comes first.***

We built Snapchat as an antidote to the context-less communication that has plagued "social media." Not so long ago, a conversation among friends would be just that: a private communication in which you knew exactly who you were talking to, what you were talking about, and whether what you were saying was being memorialized for eternity. . . .

We don't think digital communication has to be this way. That's why choice matters. We build products and services that emphasize the context of a conversation—who, when, what, and where something is being said. If you don't have the autonomy to shape the context of a conversation, the conversation will simply be shaped by the permanent feeds that homogenize online conversations.

***When you read our Privacy Policy, we hope that you'll notice how much we care about the integrity of personal communication.*** For starters, we've written our Privacy Policy in plain language because ***we think it's important***

37

Verified Shareholder Derivative Complaint

*that everyone understand exactly how we handle their information.* Otherwise, it's hard to make informed choices about how you communicate. We've also created a robust Privacy Center where we show that context and choice are more than talking points. ***There, we point out the many ways that users can control who sees their Snaps and Stories, and explain how long content will remain on our servers, how users can manage the information that we do have about them, and much more.*** This is where you'll also find our Transparency Report.

We also understand that privacy policies—no matter how ambitious—are only as good as the people and practices behind those policies. ***When someone trusts us to transmit or store their information, we know we have a responsibility to protect that information and we work hard to keep it secure. New features go through an intense privacy-review process—we debate pros and cons, and we work hard to build products we're proud of and that we'll want to use.*** We use Snapchat constantly, both at work and in our personal lives, and we handle user information with the same care that we want for our family, our friends, and ourselves.

110. The 2020 10-K continued by noting that Apple was changing its privacy policy, but discussed the known negative impacts it would have on the Company's business as mere possibilities, stating:

Furthermore, changes to iOS or Android operating systems' practices and policies, such as ***Apple's upcoming iOS update that may impose heightened restrictions on our access and use of user data, may reduce the quantity or quality of the data and metrics that can be collected or used by us and our partners, or adversely affect our ability to effectively target advertisements to users or demonstrate the value of our advertisements to advertisers, any of which could reduce the demand and pricing for our advertising products and seriously harm our business.*** The impact of these proposed changes on the overall mobile advertising ecosystem, our business, and the developers, partners, and advertisers within our community is uncertain. Depending on how these changes are implemented, how we and the overall mobile advertising ecosystem adjusts, and how our partners, advertisers, and users respond, our business could be seriously harmed. Any adverse effects could be particularly material to us because we are still early in building our advertising business. Our advertising revenue could also be seriously harmed by many other factors, including: . . . ***changes in our analytics and measurement solutions, including what we are permitted to collect and disclose under the terms of Apple's and Google's mobile***

38

Verified Shareholder Derivative Complaint

*operating systems, that demonstrate the value of our advertisements and other commercial content*; . . . [and] *our inability to measure the effectiveness of our advertising or target the appropriate audience for advertisements*[.]

*July 22, 2021 Earnings Conference Call*

111.   On July 22, 2021, Snap held an earnings conference call with investors and analysts to discuss the Company's financial results for the quarter ended June 30, 2021. On that call, Defendant Gorman said the following about the now-deployed changes to Apple's privacy policies:

> Our ad platform is being utilized as an effective self-service tool to help advertisers of all types and sizes create, manage, and measure campaigns on Snapchat. *Further, it is a reflection of our focus on privacy and innovation as we are delivering results for advertisers while also respecting the privacy of our community, which has been a core tenet since we launched ads on Snapchat.* This year has clearly demonstrated how important it is to simultaneously meet these two objectives for our advertising partners. *As Apple rolled-out its App Tracking Transparency-related changes near the end of Q2, we observed higher opt-in rates than we are seeing reported generally across the industry, which we believe is due in part to the trust our community has in our products and our business.* Apple's rollout of the most recent iOS update came later in Q2 than initially anticipated, and *the pace of updates by iPhone users has also been slower than we anticipated. This has given us more time with advertisers to navigate the transition* but also means the effects of these changes will come later than we initially expected.

112.   Defendant Gorman continued by noting that the Company was working with advertisers in light of the changes made by Apple, and represented that the Company was still effectively targeting advertisements, stating:

> We continue to work with our advertising partners on privacy-safe solutions and other attribution techniques. *For example, we fully rolled out support of SKAdnetwork version 3.0, which we believe will aid in improving attribution for advertisers who have implemented Apple's API.* We also launched Advanced Conversions in Ads Manager, which allows advertisers to measure their campaigns via our privacy-protecting measurement stack. *We are dedicated to delivering value for our advertising partners while*

39

Verified Shareholder Derivative Complaint

*respecting the privacy of our community, as we have worked to do for many years.* That said, it remains very early in the adoption of the iOS platform changes, and we will continue to learn how these changes may impact our advertising partners, business, and the industry as a whole. We are seeing some initial signals as advertisers test and learn in this new environment and this is causing some interruptions to demand that we had anticipated would be part of the adoption process, particularly in the direct response e-commerce and gaming sectors. It is too early to determine how long it will take until these changes are fully adopted, the scale of the potential interruptions to demand, or the ultimate impact on the longer term growth of our business. . . .

*We continue to invest heavily in video advertising*, with the goal of driving results for our advertising partners and connecting them to the Snapchat Generation. *For example, we worked with Nielsen to help US advertisers understand how to more efficiently reach their target audiences via Snap Ads.* The Total Ad Ratings (TAR) study analyzed how over thirty cross-platform advertising campaigns reached people on both Snapchat and television. The analysis showed that Snapchat campaigns contributed an average of 16 percent incremental reach to advertisers' target audiences, and over 70 percent of the Gen Z audience that was reached by Snapchat was not reached by TV-only campaigns. This is especially important as people are increasingly cutting the cord, and mobile content consumption continues to grow, *presenting us with a large opportunity to help advertisers reach the Snapchat Generation at scale*.

113. Defendant Gorman reiterated the Company's supposed commitment to privacy and how, due to this commitment, Apple's policy change would have little impact on the Company's business, stating:

I think the important thing about IDFA is to really understand that the solutions are not yet fully finalized. Everyone is still evolving, Apple, the entire industry is still evolving. And we've said this before, and *I just want to reiterate that we genuinely support Apple's approach. We've always believed that advertising should respect customer's privacy at its core at Snap and the products that this amazing team has built for the last almost 10 years now. And we've been working really hard to make this transition smooth for our advertising partners as well as our businesses. So where we are in the cycle right now is that we rolled out full support of SKAdnetwork version 3.0, which we know will aid or we believe will aid in attribution for advertisers.* And we've also implemented Apple's API. In

40

Verified Shareholder Derivative Complaint

addition, *we launched Advanced Conversions in Ads Manager so advertisers can measure their campaigns with our privacy conscious measurement stack.* And then, you know, I think one of the things that we're observing here is *that our opt in rates have been above what is sort of widely reported in both the press as well as with the analyst community. So that's, that's good*, but it remains so early in these iOS changes and there's no question that it will be a change for the industry in and of itself. But you know, *I think we prepared it the best that we can. The product teams and the engineering teams have been working really closely with all of our partners and our sales teams to make sure that this transition for our advertisers is as smooth as possible.*

114. The statements in ¶¶ 101–13 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) Apple's announced privacy changes were likely to have, and then did have, a material negative impact on the Company's advertising revenue; (2) the Company's purported ability to maintain its advertising revenues despite Apple's privacy changes were overstated; (3) Snap understated the risks that the change in Apple's privacy policies posed to the Company, despite these risks being known; (4) Snap's privacy policies were not in line with Apple's changes, and thus Snap would not avoid disruption caused by the changes; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, Snap's public statements were materially false and misleading at all relevant times.

## The Truth Emerges

115. On October 22, 2021, Snap filed the 3Q21 10-Q with the SEC, revealing that the Company's revenue and guidance were worse than anticipated because Apple's privacy changes had negatively affected the Company's advertising revenue and was going to continue to do so.

116. The 3Q21 10-Q discussed how Apple's privacy changes had affected the Company as follows:

41

Verified Shareholder Derivative Complaint

Furthermore, *in April 2021 Apple issued an iOS update that imposes heightened restrictions on our access and use of user data.* Google has announced that it will implement similar changes with respect to its Android operating system and major web browsers, like Safari and Chrome, may make similar changes as well*. These changes have adversely affected our targeting, measurement, and optimization capabilities, and in turn affected our ability to measure the effectiveness of advertisements on our services. This has resulted in, and in the future is likely to continue to result in, reduced demand and pricing for our advertising products and could seriously harm our business.* The impact of these changes on the overall mobile advertising ecosystem, our competitors, our business, and the developers, partners, and advertisers within our community is uncertain, and depending on how we, our competitors, and the overall mobile advertising ecosystem adjusts, and how our partners, advertisers, and users respond, our business could be seriously harmed. In addition, *if we are unable to mitigate these and future developments, and alternative methods do not become widely adopted by our advertisers, then our targeting, measurement, and optimization capabilities will be materially and adversely affected, which would in turn continue to negatively impact our advertising revenue*. *Any adverse effects could be particularly material to us because we are still early in building our advertising business.*

117. On this news, the price of the Company's stock dropped from $75.11 per share at the close of trading on October 21, 2021, to $55.14 at the close of trading on October 22, 2021, a drop of $19.97, or approximately 26.6%.

## DAMAGES TO SNAP

118. As a direct and proximate result of the Individual Defendants' conduct, Snap has lost and expended, and will lose and expend, many millions of dollars.

119. Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and certain of its officers, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

120. Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the

42

Company.

121. As a direct and proximate result of the Individual Defendants' conduct, Snap has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

## DERIVATIVE ALLEGATIONS

122. Plaintiff brings this action derivatively and for the benefit of Snap to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors, and/or officers of Snap, unjust enrichment, abuse of control gross mismanagement, waste of corporate assets, violations of the Exchange Act, and the aiding and abetting thereof.

123. Snap is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

124. Plaintiff is, and has continuously been at all relevant times, a shareholder of Snap. Plaintiff will adequately and fairly represent the interests of Snap in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

125. Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

126. A presuit demand on the Board of Snap is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants Spiegel, Murphy, Coffey, Coles, Jenkins, Lynton, Meresman, Miller, and Thorpe (collectively, the "Director-Defendants"); and nonparty Fidel Vargas (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of

43

Verified Shareholder Derivative Complaint

the ten Directors that were on the Board at the time this action was commenced.

127.  Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts and to fail to maintain internal controls, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

128.  In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

129.  Moreover, while the price of the Company's common stock was artificially inflated by the materially false and misleading statements alleged herein, Director-Defendants Spiegel, Murphy, Coles and Thorpe engaged in insider sales, collectively selling 11,311,453 while in possession of material nonpublic information for aggregate proceeds of over $784 million. Therefore, Defendants Spiegel, Murphy, Coles and Thorpe further breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

130.  Moreover, all of the Directors are beholden to Defendants Spiegel and Murphy, who together have control over 99.5% of the Company's voting power, making them controlling shareholders. As of December 31, 2021, Defendant Spiegel exercised control over 53.1% of the Company's voting power, and Defendant Murphy exercised control over 46.4% of the Company's voting power. Moreover, according to the 2021 10-

Verified Shareholder Derivative Complaint

K, both Defendant Spiegel and Defendant Murphy have entered into voting proxies that would give the other voting control over the full 99.5% of voting power if either man should die or become disabled. In light of this, the Directors cannot impartially consider a demand against Defendants Spiegel and Murphy—both of whom are interested, primary wrongdoers—as the Directors are dependent on Defendants Spiegel and Murphy for their continued employment with the Company and the lucrative compensation that goes with that. Thus, the Directors are unable to evaluate a demand with disinterest or independence because of Defendants Spiegel's and Murphy's control over them.

131. Additional reasons that demand on Defendant Spiegel is futile follow. Defendant Spiegel cofounded the Company with Defendant Murphy and has served as CEO and as a director since March 2012. As described above, he is also a controlling shareholder upon whom the remaining Directors are dependent. The Company provides Defendant Spiegel with his principal occupation, for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. Moreover, he engaged in insider sales at artificially inflated prices, worth approximately $649 million, during the Relevant Period. As CEO, Defendant Spiegel was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the 2Q21 10-Q and the 2020 10-K, which he signed and/or for which he signed SOX certifications. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Spiegel is a defendant in the Securities Class Action. For these reasons, too, Defendant Spiegel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

Verified Shareholder Derivative Complaint

132. Additional reasons that demand on Defendant Murphy is futile follow. Defendant Murphy cofounded of the Company with Defendant Spiegel and has served as the Company's CTO and as a director since March 2012. As described above, he is also a controlling shareholder upon whom the remaining Directors are dependent. The Company provides Defendant Murphy with his principal occupation, for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. Moreover, he engaged in insider sales at artificially inflated prices, worth approximately $134 million, during the Relevant Period. Defendant Murphy bears significant responsibility for the false and misleading statements and omissions that were made, including those contained in 2020 10-K, which he signed. As the Company's CTO and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Murphy breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

133. Additional reasons that demand on Defendant Coffey is futile follow. Defendant Coffey has served as a Company director since May 2020. She also serves as a member of the Audit Committee. As detailed above, she receives substantial compensation for these roles. She is dependent on Defendants Spiegel and Murphy who, as controlling shareholders, can remove her as a director whenever they choose. Defendant Coffey bears significant responsibility for the false and misleading statements and omissions that were made including those contained in 2020 10-K, which she signed. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the

46

Verified Shareholder Derivative Complaint

scheme, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Coffey breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

134. Additional reasons that demand on Defendant Coles is futile follow. Defendant Coles has served as a Company director since December 2015. She also serves as Chair of the Nominating and Corporate Governance Committee. As detailed above, she receives substantial compensation for these roles. She is dependent on Defendants Spiegel and Murphy who, as controlling shareholders, can remove her as a director whenever they choose. Defendant Coles bears significant responsibility for the false and misleading statements and omissions that were made including those contained in 2020 10-K, which she signed. Moreover, she engaged in insider sales at artificially inflated prices, worth approximately $986,000, during the Relevant Period. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Coles breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

135. Additional reasons that demand on Defendant Jenkins is futile follow. Defendant Jenkins has served as a Company director since December 2020. She also serves as a member of the Audit Committee. As detailed above, she receives substantial compensation for these roles. She is dependent on Defendants Spiegel and Murphy who, as controlling shareholders, can remove her as a director whenever they choose. Defendant Jenkins bears significant responsibility for the false and misleading statements and omissions that were made including those contained in 2020 10-K, which she signed. As a trusted Company director, she conducted little, if any, oversight of the Company's

47

Verified Shareholder Derivative Complaint

engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Jenkins breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

136. Additional reasons that demand on Defendant Lynton is futile follow. Defendant Lynton has served as a Company director since April 2013 and as Chairman of the Board since September 2016. He also serves as Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. As detailed above, he receives substantial compensation for these roles. He is dependent on Defendants Spiegel and Murphy who, as controlling shareholders, can remove him as a director whenever they choose. Defendant Lynton bears significant responsibility for the false and misleading statements and omissions that were made including those contained in 2020 10-K, which he signed. As the trusted Chairman of the Board, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Lynton breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

137. Additional reasons that demand on Defendant Meresman is futile follow. Defendant Meresman has served as a Company director since July 2015. He also serves as Chair of the Audit Committee. As detailed above, he receives substantial compensation for these roles. He is dependent on Defendants Spiegel and Murphy who, as controlling shareholders, can remove him as a director whenever they choose. Defendant Meresman bears significant responsibility for the false and misleading

48

Verified Shareholder Derivative Complaint

statements and omissions that were made including those contained in 2020 10-K, which he signed. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Meresman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

138. Additional reasons that demand on Defendant Miller is futile follow. Defendant Miller has served as a Company director since October 2016. He also serves as a member of both the Audit Committee and the Compensation Committee. As detailed above, he receives substantial compensation for these roles. He is dependent on Defendants Spiegel and Murphy who, as controlling shareholders, can remove him as a director whenever they choose. Defendant Miller bears significant responsibility for the false and misleading statements and omissions that were made including those contained in 2020 10-K, which he signed. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons too, Defendant Miller breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

139. Additional reasons that demand on Defendant Thorpe is futile follow. Defendant Thorpe has served as a Company director since August 2018. She also serves as a member of both the Audit Committee and the Compensation Committee. As detailed above, she receives substantial compensation for these roles. She is dependent on Defendants Spiegel and Murphy who, as controlling shareholders, can remove her as a

49

Verified Shareholder Derivative Complaint

director whenever they choose. Defendant Thorpe bears significant responsibility for the false and misleading statements and omissions that were made including those contained in 2020 10-K, which she signed. Moreover, she engaged in insider sales at artificially inflated prices, worth approximately $152,000, during the Relevant Period. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons too, Defendant Thorpe breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

140.   Additional reasons that demand on the Board is futile follow.

141.   The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendants Spiegel and Murphy cofounded the Company together ten years ago, in March 2012, and have served together as directors and executives of the Company since that time. For seven of those ten years, Defendants Coles, Lynton, and Morrow have worked with them, each having joined in 2015; for six of those ten years Defendant Miller has too, having joined in 2016. Furthermore, Defendants Jenkins and Lynton worked at various Sony Group Corporation ("Sony") subsidiaries for many years. Defendant Jenkins worked at Sony subsidiaries from 2008 to 2018 and Defendant Lynton worked at Sony subsidiaries from 2004 to 2017. These conflicts of interest precluded Defendants Spiegel, Murphy, Coles, Jenkins, Lynton, and Miller from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Defendants Spiegel, Murphy, Coles, Jenkins, Lynton, and Miller would be futile.

Verified Shareholder Derivative Complaint

142. Defendants Coffey, Jenkins, Meresman (as Chair), Miller, Thorpe, and Lynton (the "Audit Committee Defendants"), served on the Company's Audit Committee during the Relevant Period, including for the filing or preparation of the 2020 10-K.[3] The Audit Committee Defendants violated the Audit Committee Charter by engaging in or permitting the scheme to issue materially false and misleading statements to the investing public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Also in violation of the Audit Committee Charter, the Audit Committee Defendants failed to adequately oversee Snap's financial reporting processes and system of internal and disclosure controls, review the Company's SEC filings, assess and manage risk, monitor compliance with the Code of Conduct, and review the Company's data privacy rules. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

143. The Director-Defendants violated Snap's Code of Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the investing public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Also in violation of the Code of Conduct, the Director-Defendants failed to comply with all applicable laws and policies, act to uphold the Code of Conduct, safeguard corporate assets, keep accurate records, and communicate truthfully about the Company. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

144. The Director-Defendants also violated the Corporate Governance Guidelines

---

[3] Defendant Lynton ceased serving on the Audit Committee in December 2020. Upon information and belief, he was a member of the Audit Committee for some of the preparation of the 2020 10-K, which was filed with the SEC in February 2021.

Verified Shareholder Derivative Complaint

by engaging in or permitting the scheme to issue materially false and misleading statements to the investing public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Corporate Governance Guidelines, the Director-Defendants failed to provide adequate oversight and strategic guidance to management, fulfill their fiduciary duties and exercise their business judgment appropriately, assess and address risks adequately, and maintain Snap's integrity. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

145.   Snap has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or any others who were responsible for that wrongful conduct to attempt to recover for Snap any part of the damages Snap suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

146.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

147.   The acts complained of herein constitute violations of fiduciary duties owed by Snap's controlling shareholder, officers, and directors, and these acts are incapable of ratification.

148.   The Director-Defendants may also be protected against personal liability for

Verified Shareholder Derivative Complaint

their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Snap. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue the Director-Defendants or certain of the officers of Snap, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

149.   If there is no directors' and officers' liability insurance, then the Directors will not cause Snap to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

150.   Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

151.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

152.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Snap's business and affairs.

153. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

154. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Snap.

155. In breach of their fiduciary duties owed to Snap, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) Apple's announced privacy changes were likely to have, and then did have, a material negative impact on the Company's advertising revenue; (2) the Company's purported ability to maintain its advertising revenues despite Apple's privacy changes were overstated; (3) Snap understated the risks that the change in Apple's privacy policies posed to the Company, despite these risks being known; (4) Snap's privacy policies were not in line with Apple's changes, and thus Snap would not avoid disruption caused by the changes; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, Snap's public statements were materially false and misleading at all relevant times.

156. In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

157. Moreover, in breach of their fiduciary duties, seven of the Individual Defendants engaged in insider sales while the price of the Company's common stock was artificially inflated by the false and misleading statements at issue, netting collective proceeds of over $818 million.

158. The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading

Verified Shareholder Derivative Complaint

statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

159. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

160. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

161. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Snap has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

162. Plaintiff on behalf of Snap has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

163. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

164. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the

Verified Shareholder Derivative Complaint

Individual Defendants were unjustly enriched at the expense, and to the detriment, of Snap.

165. The Individual Defendants either benefitted financially from the improper conduct from their having, received unjustly lucrative bonuses tied to the false and misleading statements; received bonuses, stock options, or similar compensation from Snap that was tied to the performance or artificially inflated valuation of Snap; or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

166. Plaintiff, as a shareholder and representative of Snap, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

167. Plaintiff on behalf of Snap has no adequate remedy at law.

### THIRD CLAIM

### Against the Individual Defendants for Abuse of Control

168. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

169. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Snap, for which they are legally responsible.

170. As a direct and proximate result of the Individual Defendants' abuse of control, Snap has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

171. Plaintiff on behalf of Snap has no adequate remedy at law.

Verified Shareholder Derivative Complaint

## FOURTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

172. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

173. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Snap in a manner consistent with the operations of a publicly-held corporation.

174. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Snap has sustained and will continue to sustain significant damages.

175. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

176. Plaintiff on behalf of Snap has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

177. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

178. As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

179. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

180. Plaintiff on behalf of Snap has no adequate remedy at law.

Verified Shareholder Derivative Complaint

## SIXTH CLAIM

### Against Defendants Spiegel, Andersen, Gorman, and Morrow for Contribution Under Sections 10(b) and 21D of the Exchange Act

181. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

182. Snap, along with Defendants Spiegel, Andersen, Gorman, and Morrow are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Spiegel's, Andersen's, Gorman's, and Morrow's willful and/or reckless violations of their obligations as officers and/or a controlling shareholder and director of Snap.

183. Defendants Spiegel, Andersen, Gorman, and Morrow, because of their positions of control and authority as officers and/or a controlling shareholder and director of Snap, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Snap, including the wrongful acts complained of herein and in the Securities Class Action.

184. Accordingly, Defendants Spiegel, Andersen, Gorman, and Morrow are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

185. As such, Snap is entitled to receive all appropriate contribution or indemnification from Defendants Spiegel, Andersen, Gorman, and Morrow.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

Verified Shareholder Derivative Complaint

(a)    Declaring that Plaintiff may maintain this action on behalf of Snap, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Snap;

(c)    Determining and awarding to Snap the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Snap and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Snap and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Snap to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Snap restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

Verified Shareholder Derivative Complaint

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 8, 2022

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: */s/ Laurence M. Rosen*
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

60

Verified Shareholder Derivative Complaint

## VERIFICATION

I, Tim Dodds am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of 3/3/2022 _____, 2022.

DocuSigned by:

*Tim Dodds*

A8E190CB4E8843E...

Tim Dodds